1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10
11

JOSEPH SON,

Case No.   1:20-cv-01726-JLT-HBK (HC)

12

Petitioner,

FINDINGS AND RECOMMENDATIONS TO DENY PETITIONER'S PETITION AND DECLINE TO ISSUE A CERTIFICATE OF APPEALABILITY [1]

13

v.

14

BRIAN KIBLER,

FOURTEEN-DAY OBJECTION PERIOD

15

Respondent.

16
17
18

**I.    STATUS**

19

Petitioner Joseph Son ("Petitioner" or "Son"), a state prisoner, is proceeding pro se on his

20

Petition for Writ of Habeas Corpus filed under 28 U. S.C. § 2254 on November 30, 2020.  (Doc.

21

No. 1, "Petition").  Petitioner, who was incarcerated and serving an indeterminate life sentence

22

having been convicted of a prior felony,[2] was charged by Information with Penal Code section

23

4500 for the alleged killing of fellow inmate, Michael Graham, at Wasco State Prison (Case No.

24

BF150700A).  (Doc. No. 11-2 at 99, 104-05)[3].  After a jury trial, Son was found guilty of

25
26

[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302 (E.D. Cal. 2022).

27

[2] Petitioner previous conviction of Penal Code section 206, Torture, a felony, was on or about September 9, 2011.

28

[3] All citations to the pleadings and record are to the page number as it appears on the Case Management and Electronic Case Filing ("CM/ECF") system.

voluntary manslaughter in violation of Penal Code section 192(a).  (Doc. No. 11-12 at 9).  The Kern County Superior Court sentenced Son to an enhanced 27-year sentence, to be served consecutive to his current sentence, and ordered him to pay a $30 court facilities assessment (Gov. Code, § 70373), a $40 court operations assessment (§ 1465.8), and a $280 restitution fine (§ 1202.4, subd. (b)).  (Doc. No. 11-12 at 2-33).  The Fifth Appellate District Court of Appeal affirmed Son's judgment, except to the extent Son was to be afforded an opportunity to request an ability to pay hearing with respect to the court facilities fee assessment (approximately $70).  (Doc. No. 11-22 at 1-56).  On August 24, 2022, the California Supreme Court summarily denied Son's petition for review without prejudice.[4]  (Doc. No. 11-23 at 1).

Petitioner filed a skeletal Petition that does not identify grounds for relief in the body of the Petition.  (*See generally* Doc. No. 1). The Petition instead directs the Court to "See Addendum."  (*Id*. at 3).[5]  The Addendum is comprised of "Appellant's Petition for Review" that was submitted to the Supreme Court of California (Doc. No. 1 at 11- 110).  The most generous reading of the Petition is that Petitioner advances the following three federal claims, each of which he advanced on direct appeal and in his petition to the California Supreme Court:

> (1) Son's Sixth Amendment Right to Counsel was Violated When Defense Counsel Selected, With the Trial Court's Approval, to Pursue Self-Defense as a Trial Theory When Son's Objective of His Defense was to Assert Innocence;
>
> (2) Prejudicial Error Occurred When the Trial Court Failed to Instruct on Involuntary Manslaughter as a Lesser Included Offense in Violation of Son's Due Process and Fair Trial Rights Under the Sixth and Fourteenth Amendments; and

---

[4] The petition was denied without prejudice "to any relief to which defendant might be entitled after this court decides *People v. Kopp*, S257844." (*Id*.).

[5] Petitioner submits a Declaration of Kevin D. Bryant, an inmate, in support of his Petition.  (Doc. No. 1 at 6).  Bryant states Son claims he was innocent but forced under duress to plead self-defense by his defense counsel and seeks review of the grounds Son raised in his petition to the California Supreme Court on direct appeal as the grounds in his Petition.  (*Id*.).  To the extent Bryant seeks to act as legal counsel for Petitioner, the Court notes "pro se prisoner litigants do not enjoy an absolute right to have a jailhouse lawyer assist with legal representation, make appearances on their behalf, or file papers with the court as the litigant's legal representative."  *Nicklas v. Giordano*, 2014 WL 3405833, at *8 (C.D. Cal. July 10, 2014); *see also Johns v. County of San Diego*, 114 F.3d 874, 876 (9th Cir. 1997) (citing *C.E. Pope Equity Trust v. United States*, 818 F.2d 696, 697 (9th Cir. 1987) (internal quotations omitted) ("While a non-attorney may appear pro se on his own behalf, he has no authority to appear as an attorney for others than himself.").  Regardless, the Court will proceed to consider the identified grounds for relief as they are identical to those raised by Son in his Petition.

(3) The Fines, Fees, And Assessments Should Be Stayed Because There Was No Finding Son Had the Ability to Pay in Violation of Due Process, Equal Rights and Cruel and Unusual Punishment Prohibitions.

(*See generally* Doc. No. 1 at 18-19). Respondent filed an Answer (Doc. No. 14) and lodged the state court record in support (Doc. No. 11, 11-1 through 11-23). Petitioner elected not to file a Reply to the Answer. This matter is deemed submitted on the record before the Court. After careful review of the record and applicable law, the undersigned recommends the district court deny Petitioner relief on his Petition and decline to issue a certificate of appealability.

## II.   GOVERNING LEGAL PRINCIPLES

### A.   Evidentiary Hearing

"In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id*. Petitioner did not request an evidentiary hearing. This Court independently finds that the pertinent facts of this case are fully developed in the record before the Court; thus, no evidentiary hearing is required.

### B.   AEDPA General Principles

A federal court's statutory authority to issue habeas corpus relief for persons in state custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). AEDPA requires a state prisoner seeking federal habeas relief to first "exhaus[t] the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). If the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on the merits, then the AEDPA mandates a deferential, rather than *de novo*, review. *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1604 (2016). This deferential standard, set forth in § 2254(d), permits relief on a claim adjudicated on the merits, but only if the adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This standard is both mandatory and intentionally difficult to satisfy. *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

"Clearly established federal law" consists of the governing legal principles in the decisions of the United States Supreme Court when the state court issued its decision.  *White*, 572 U.S. at 419.  Habeas relief is appropriate only if the state court decision was "contrary to, or an unreasonable application of," that federal law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts.  *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  *Williams v. Taylor*, 529 U.S. 362, 407, (2000).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  The petitioner must show that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement."  *Id.* at 103.

When reviewing a claim under § 2254(d), any "determination of a factual issue made by a State court shall be presumed to be correct [,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Burt*

1    *v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable

2    merely because the federal habeas court would have reached a different conclusion in the first

3    instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

4    Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any

5    constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v.*

6    *Abrahamson*, 507 U.S. 619, 637 (1993).  As the Supreme Court recently explained, while the

7    passage of AEDPA "announced certain new conditions to [habeas] relief," it didn't

8    eliminate *Brecht's* actual-prejudice requirement.  *Brown v. Davenport*, ⎯⎯ U.S. ⎯⎯, 142 S. Ct.

9    1510, 1524, 212 L.Ed.2d 463 (2022).  In other words, a habeas petitioner must satisfy *Brecht*,

10   even if AEDPA applies.  *See id.* at 1526 ("[O]ur equitable precedents remain applicable 'whether

11   or not' AEDPA applies.") (*citing* Fry v. Pliler, 551 U.S. 112, 121, 127 S.Ct. 2321, 168 L.Ed.2d

12   16 (2007)).  In short, a "federal court must deny relief to a state habeas petitioner who fails to

13   satisfy either [*Brecht*] or AEDPA.  But to grant relief, a court must find that the petition has

14   cleared both tests." *Id*. at 1524.

15   As discussed *supra*, for the deferential § 2254(d) standard to apply there must have been

16   an "adjudication on the merits" in state court.  An adjudication on the merits does not require that

17   there be an opinion from the state court explaining the state court's reasoning.  *Richter*, 562 U.S.

18   at 98.  "When a federal claim has been presented to a state court and the state court has denied

19   relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

20   of any indication or state-law procedural principles to the contrary." *Id*. at 99.  "The presumption

21   may be overcome when there is reason to think some other explanation for the state court's

22   decision is more likely." *Id*. at 99-100.  This presumption applies whether the state court fails to

23   discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S.

24   289, 293, 298-301 (2013).

25   While such a decision is an "adjudication on the merits," the federal habeas court must

26   still determine the state court's reasons for its decision to apply the deferential standard.  When

27   the relevant state-court decision on the merits is not accompanied by its reasons,

28   the federal court should "look through" the unexplained decision to

5

the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The federal court "looks through" the silent state court decision "for a specific and narrow purpose—to identify the grounds for the higher court's decision, as AEDPA directs us to do." *Id.* at 1196.

### III.     RELEVANT FACTUAL BACKGROUND

The Court adopts the pertinent facts of the underlying offenses, as summarized by the California Fifth District Court of Appeal. A presumption of correctness applies to these facts. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015). Furthermore, Petitioner adopts the following statement of facts in his California Supreme Court petition. (*See* Doc. No. 1 at 24).

<u>**FACTS**</u>

**A.  Cellmates at Wasco State Prison**

On October 10, 2011, Bradley Winters was working as a correctional officer at Wasco State Prison in Kern County. He was one of three "floor officers" in Baker Building 5, which housed about 200 inmates, with two inmates per cell. The cell doors could only be opened by an officer in the control booth. Son and Michael Graham occupied cell 228. On that same side of the building, there was a temporary overflow section, known as the "T-bunk" area, that housed approximately 30 inmates.

**B.  Son's Request for a Cell Change**

That afternoon, Winters was working the third "watch" or shift, which ran from 2:00 p.m. to 10:00 p.m. [N.3] Beginning at about 4:45 p.m., he conducted a head count of inmates to ensure they were all present. This usually took 15 minutes and had to be completed and reported by 5:00 p.m. Inmates were supposed to stand and show their I.D. cards. The cell doors remained closed.

When Winters reached cell 228, Son was standing, but Graham remained lying on his lower bunk with his head facing the door and his hands on his chest or stomach. Winters made eye contact with Graham but did not make him stand, as Winters did not want to lose mental track of the count. [N.4]

6

Son asked to be moved to a different cell, but Winters explained that cell moves, with the exception of "emergency moves," were done on the second watch. Son was, however, "adamant" that he wanted to move as he had found a cellmate on the other side of the building. Winters, in response, advised Son to talk to the "second watch" officer.

Since Wasco is a "reception center," new inmates arrived continuously and needed to be housed. Consequently, non-emergency or "[c]onvenience moves" were a "fairly common occurrence," and were overseen by a "housing officer" during the second watch. Winters did not detect any emergency in connection with Son's request to move to a different cell. Nor did Son indicate there was an emergency, or even suggest he was having problems with Graham. Had Son indicated there was an emergency, the revelation would have prompted Winters to abandon the headcount and "immediately" separate the cellmates. Son had not asked Winters for a cell move on any other occasion.

[N.3] There were three watches: 10:00 p.m. to 6:00 a.m. (first watch); 6:00 a.m. to 2:00 p.m. (second watch); and 2:00 p.m. to 10:00 p.m. (third watch).

[N.4] Winters accurately noted in a watch logbook that Graham was lying down during the count. He knew, however, that he would get into trouble for not having Graham stand. Subsequently, he did in fact receive a letter of reprimand for the lapse omitted.

## C.      Graham's Death

About 20 minutes later, when Winters was in his office, he heard inmates from the bunk area yelling "man down" and pointing to cell 228. Winters went to cell 228 and saw Son washing his hands at the sink at the front of the cell; Son was also yelling "man down." Son moved to the back of the cell, then returned to the front to wash his hands again. Graham was still lying on his bunk in about the same position as before. His eyes were open and appeared to be looking up, and his palms were along his sides. He showed no visible signs of life.

Winters reported a medical emergency ("Code 1 medical"). Son remarked to Winters, "I told you I need to move." Son appeared calm and was not "worked up at all." He did not look scared, nor was he breathing hard. He never said he was attacked or hurt.

An officer in the control booth opened the door of Son's cell. Son was handcuffed—he needed two sets of handcuffs because he was "big, stocky," and "hefty"—and taken to a holding cell. [N.5] Medical staff arrived and unsuccessfully performed CPR on Graham.

Nurse Laura Bernal noticed that Graham showed no signs of life and was "cool to the touch," which usually occurs "a little time" after death. Physically, he seemed "[f]rail." Bernal noted Graham had "bruises all over [his upper torso]" and his "chest was collapsed

7

in," something she had never seen before. In attempting to administer CPR, Bernal discovered that Graham's chest had "no resistance." There was "no bone structure"; rather "[i]t had the consistency of … jello."

Sergeant Bill Eveland similarly noticed bruising all over Graham's torso, along with the fact that the center of Graham's "chest was kind of concave, abnormal looking." Eveland and three other officers carried Graham to a gurney; Graham was taken to the prison's emergency room, where he was declared dead. Son, who was in a holding cell, remarked to Eveland: "Is he dead? He fell down twice and I helped him up."

Son was searched for contraband (including weapons) but none was found. Nor were any injuries detected on his body. Officer Robert Zaragoza photographed cell 228, which had been padlocked following Graham's death. Zaragoza determined that "nothing was disturbed" in the cell. He explained: "[T]here was no struggle as I viewed the cell inside; however, I have been in numerous cells when I've done crime scenes, and I've discovered different evidence whereas this one I didn't discover anything that would lead me to believe there was a struggle involved." Zaragoza did not find any weapons in the cell or in the toilet. Zaragoza did, however, discover two letters sent to Son by another inmate, discussing the possibility of Son moving to a different cell. [N.6]

[N.5] Son was approximately 5'5'' tall and weighed 235 pounds. Graham was 5'9'' tall and weighed 161 pounds.

[N.6] Since his arrival on September 16, 2011, at Wasco State Prison, Son had three other cellmates before he was housed with Graham on September 26, 2011.

## D.     Graham's Autopsy

Forensic pathologist Robert Whitmore performed an autopsy on Graham's body. Dr. Whitmore determined that the cause of death was "multiple blunt force trauma," that in turn caused bleeding and impaired Graham's ability to breathe. Dr. Whitmore's conclusions were based on numerous injuries to Graham's chest, abdomen, and neck. Each of Graham's lungs had a large bruise and the lower lobes were internally torn, which would have required "[a] large force" because the chest had to be "completely compressed" to cause such damage. Graham suffered "multiple fractures" to his ribs and bled internally. His sternum was fractured twice, which was the reason his chest appeared concave. There was a hemorrhage to the pericardium, normally protected by the rib cage. There was a large periaortic hematoma to the superior mesenteric artery, contusions to the vena cava, bleeding in the intestinal cavity, a subscapular hematoma on the liver, a lacerated spleen, and contusions to the duodenum and large bowel. Graham's neck muscles had hemorrhaged, which was "consistent with strangulation or an attempted strangulation or a grabbing of the neck or a blow to the neck." Graham had no injuries to his hands.

8

Dr. Whitmore clarified that the chest injuries Graham suffered were not caused by CPR. He explained, a "large force" was "applied to the chest" to cause these injuries. The macerated lungs were not caused by CPR, but by squishing the chest so completely that it was rendered "flat." As for the "sternal fractures," while those could occur with CPR, "a twice fractured sternum" was "not very common in CPR. In addition, the fact that Nurse Bernal noticed a depression in Graham's chest before she commenced CPR demonstrated that the injuries were not caused by CPR. Dr. Whitmore also noted that Graham suffered from chronic hepatitis C and associated liver cirrhosis, which would make a person weak and cause the person to bleed and bruise more easily than he would otherwise. However, Dr. Whitmore clarified that these diseases would not make rib and sternum fractures more likely, nor would they make tissues more prone to tearing.

Following Graham's death, Son was incarcerated at Corcoran State Prison. There, he told Officer Alonzo Aranda that he knew martial arts and would get Aranda tickets to his fights when he got out of prison. Son talked about his knowledge of martial arts with Aranda on at least three occasions. Son also told Aranda that were the latter to encounter problems with inmates, he should put them in Son's cell and Son "would take care of 'em like he did his last cellie."

**E.    Defense**

Son took the stand in his own defense and explained he was first arrested in 2008 and incarcerated in the county jail for three and a half years until he was sentenced to state prison. Once in prison, he was attacked on nine occasions by inmates and learned it was better for him to lose a fight because otherwise, as an Asian, he would suffer severe retaliation. When Son was moved to cell 228, his cellmate, Graham, repeatedly berated him with racial epithets, told him to leave, and beat him. Graham had also noted that he was suicidal and had no problem killing himself as well as Son. Officer Winters, however, refused to move Son despite Graham's abusive conduct.

On the day in question, Graham attacked Son with a knife. Son managed to take it away and slammed Graham hard against a wall and hit him "at least eight to twelve times nonstop" in the torso. Thereafter, the two made up and Graham flushed the knife down the toilet. Graham subsequently fell down, twice. Son helped him up both times and then summoned officers for help.

Son acknowledged he was convicted of two felony crimes of moral turpitude in 2008 and torture in 2010; he had lied to the Huntington Police Department about his involvement in the latter. Son described himself as a "nonviolent" person. Nonetheless, he admitted that his conviction for torture stemmed from a Christmas Eve incident in which he raped a woman three times with the help of his cohorts and held a gun to her head. He further admitted he remained at large for 19 years after the rape and did not turn himself in to authorities. Prior to his apprehension, he fought in martial arts cage or ring matches that essentially had "no rules."

9

1

2

3

Nurse Joni Jones testified that Graham had been prescribed Cogentin, Risperdal, and Venlafaxine (Effexor). He had recently been on suicide watch at Wasco State Prison, had a history of being suicidal, and was hospitalized in Vacaville on three or four occasions for being a danger to himself.

4

5

6

7

Forensic toxicologist, Dr. John Treuting, explained that Graham had been prescribed Risperidone, which is used to treat schizophrenia, and Venlafaxine for "major depression." Dr. Treuting determined that Graham's toxicology level for Venlafaxine (and its byproduct, O-desmethylvenlafaxine) was "significantly higher" than the therapeutic level, which may cause hostility, agitation, and suicidal inclination.

8

**F.    Rebuttal**

9

10

11

On April 15, 2016, at Donovan State Prison, Son went "ballistic" because an officer told him not to cover up his cell window. Son called the officer "the 'N' word" and threatened to "beat … [his] ass."

12

13

On May 3, 2017, at Lancaster State Prison, an officer observed Son run down the stairs, notwithstanding his use of a wheelchair during the instant trial.

(Doc. No. 11-22 at 3-9).

14

## IV.    ANALYSIS

15

16

17

18

19

Each of Petitioner's grounds were raised on direct appeal to the Fifth District Court of Appeal and denied on the merits[6] and subsequently summarily denied by the California Supreme Court.  Thus, the claims are exhausted, and the Court looks through to the Fifth District's reasoned decision in evaluating each of Petitioner's claims under the deferential standard of review.  *Wilson v. Sellers*, 138 S. Ct. at 1192.

20

### A. Ground One-Sixth Amendment Error

21

22

23

24

25

26

In his first ground for relief, Petitioner argues that his trial counsel's pursuit of a self-defense theory in contravention to his insistence that he wished to pursue an actual innocence theory violated his Sixth Amendment rights under *McCoy v. Louisiana*, 584 U.S. 414 (2018). Petitioner insists that his defense counsel selected, with the trial court's approval, to pursue self-defense as a trial defense theory when Son's objective of his defense was to assert innocence. (Doc. No. 1 at 24).

27

28

---

[6] As noted *supra*, Petitioner was afforded a hearing in connection with the court facilities assessments.

10

*McCoy* holds that a when a client expressly asserts their desire to maintain their innocence, their lawyer "must abide by that objective and may not override it by conceding guilt." 585 U.S. at 423.  Recognizing the division of labor between trial counsel and  a defendant, the Court held "[w]ith individual liberty—and, in capital cases, life—at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt."[7]  *Id*. at 417.  The Supreme Court clarified that this is a "structural error" and not one that falls within the purview of the Court's "ineffective-assistance-of-counsel jurisprudence."  *Id*. at 427.  *McCoy* is only applicable where trial counsel concedes guilt "over the defendant's intransigent and unambiguous objection." *Id*. at 420.

The state appellate court rejected Petitioner's claim on two grounds.  First, the court found *McCoy* did not apply to Petitioner's case.  Specifically, the court found that trial counsel did not concede Son's guilt.  The appellate court found the following facts gleaned from the record pertinent.

> Son bases his *McCoy* claim on statements made in *Marsden* and *Marsden/Faretta* hearings that occurred during the infancy of this case, specifically on May 21, 2014, and June 26, 2014, over three years before the July 2017 trial. (People v. Marsden (1970) 2 Cal.3d 118 (*Marsden*); *Faretta v. California* (1975) 422 U.S. 806.)

> In a *Marsden* hearing held on May 21, 2014, Son told the court defense counsel was exploring a self-defense theory for Son's defense. Son was not in favor of a self-defense theory and emphatically disagreed with defense counsel's exploration of this theory. Regarding the incident underlying the charge, Son explained: "I didn't do it. Never touched the guy." Son continued: "I'm like there's got to be a better defense to this, especially when I never touched the guy." Son complained defense counsel was not listening to him and had his "own agenda," adding "I told him from the git-go I didn't touch him, I didn't do it." Defense counsel, for his part, explained to the court:

>> "It makes sense to me as an officer of the court and to diligently pursue every defense for Mr. Son that two gentlemen were in a cell and one is accused to have beaten the other to death, no one had access to the cell – those are at least the accusations—that I would have a job to pursue

---

[7] Other rights that belong to the defendant are "whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." *McCoy*, 585 U.S. at 421.

11

self-defense claims. I had started doing that. So the Court knows, I've been tracking down the alleged victim Michael Thomas Graham's criminal record, which includes some violent offenses in both San Luis Obispo County, San Bernardino County, Santa Clara and San Francisco.

"I believe in a death penalty case, I have a duty to pursue that. I'm not saying we are not going to pursue Mr. Son's defense. He wasn't there in the cell or the cell door was open, I'm not saying that. But I also am trying to explain to him why I'm doing what I'm doing."

Thereafter, the court and defense counsel had the following exchange:

"THE COURT: [Defense counsel], pursuing a defense, you are looking at all defenses, including self-defense, including Mr. Son wasn't there, including Mr. Son had nothing to do with it, even if he was there?

"[DEFENSE COUNSEL]: Yes.

"THE COURT: You have not made up your absolute mind if this is going to be a self-defense case?

"[DEFENSE COUNSEL]: No, I have not. I'm just trying to keep an open mind."

The court denied the Marsden motion.

Thereafter, at a June 26, 2014 Marsden/Faretta hearing, the court asked Son to explain his contention that he should be allowed to represent himself because of a conflict of interest with counsel. The following exchange then took place:

"THE DEFENDANT: I think there's trust issues. I clearly told [defense counsel] the very first day I met him that I'm innocent, that I didn't beat the guy up, and it's as though he never heard me because he's telling me he wants to do a self-defense. And I didn't repeat myself after he told me that because I'm, like, 'wow.'

"THE COURT: Okay. So your attorney is recommending that you at least pursue one avenue, of raising a self-defense, as a defense, and you don't wish to do that because you perceive that's inconsistent with your position that you did not do what you've been accused of; would that be a fair statement?

"THE DEFENDANT: Right.

"THE COURT: All right.

"THE DEFENDANT: It's like he's not even hearing me. He wants to do his own thing."

1
2

The court granted the *Faretta* motion; however, the same defense counsel was later reappointed.

3
4
5
6
7
8
9
10
11
12
13

Another *Marsden* hearing was held approximately three years later, on July 12, 2017, after jury selection but before the evidentiary phase of the trial commenced. Son's statements to the court at this hearing were consistent, not with his statements at the early *Marsden* and *Marsden/Faretta* hearings described above but, rather, with his trial testimony, which occurred a few days later, on July 18, 2017. As summarized above, Son testified at trial that, on the day in question, Graham attacked Son with a knife. Son managed to take it away and slammed Graham from "wall to wall," "slammed [him] every direction," as hard as he could. Son then "started striking" Graham; he "hit him at least eight to twelve times nonstop," as hard as he could, in the torso. Thereafter, the two made up and Graham flushed the knife down the toilet. Graham subsequently fell down, twice. Son helped him up both times and then summoned officers for help. Son testified he was "not a killer" and "didn't kill Mr. Graham." He explained: "It was the heat of the moment, the knife is there, I had to get him off of me and I swung as fast as I can. I threw a burst of punches, 8 to 10." He added: "I did not want Mr. Graham to die, but he did, even though I tried my best to guarantee he wouldn't die and not hit him in the face or the neck. I didn't stab him, I didn't choke him, I didn't hit him in the face, but he still died."

14
15
16
17
18

Defense counsel's closing argument was consistent with Son's testimony. He contended Graham "attacked" Son and "hit him." He argued Son was "not a killer." He explained: "There is no direct evidence that Son was trying to kill Graham. If you were trying to kill someone, you would go for their face and their skull. He's got a small contusion right here and a tiny scratch on his head. That's it." Counsel argued that Son acted to defend himself when Graham brought out a knife.

19

(Doc. No. 11-22 at 10-13).

20

The appellate court found the "record" before it "markedly different from that in *McCoy*."

21

*Id*. at 15.  Significantly, the court found that in the early stages and before the preliminary

22

hearing, May and June, 2014, Son insisted he did not touch Graham and did not want trial counsel

23

to pursue a self-defense theory and counsel acknowledged he was investigating various defenses,

24

including self-defense given the infancy of the case. (*Id*.)  By the time of trial in July 2017, Son

25

had changed his mind as reflected by Son's statements at the July 12, 2017 Marsden hearing, and

26

his own trial testimony that he acted in self-defense and did not intend to kill Graham.  (*Id*.).

27

Further critical was the fact that trial counsel during closing did not admit guilt, but instead

28

argued that Son acted in self-defense consistent with Son's own testimony.  (*Id*.).

13

1    Second, as noted *supra*, the appellate court went to great lengths in examining record and

2    its procedural history to find Son did not communicate an intransigent and unambiguous

3    objection regarding his actual innocence defense.  Noteworthy, the state court found Son failed to

4    show a *McCoy* error because there was "no evidence of *persistent* disagreement between Son and

5    counsel as to the theory of defense."  (*Id*., italics in original).  Rather "the record reasonably

6    shows Son and defense counsel were ultimately in sync as to the theory of defense presented to

7    the jury." (*Id*.).

8    Here, the state court correctly identified and applied *McCoy* as the correct governing

9    federal law.  And, Petitioner does not claim, yet alone demonstrate, that the state court's decision

10   was based on an unreasonable determination of the facts considering the evidence presented in

11   the State court.  Thus, the Court finds Petitioner is not entitled to relief on Ground One since the

12   state court properly identified and applied federal governing law consistent with the facts of

13   record.

14                    **B.  Ground Two - Jury Instruction**

15   Petitioner assigns prejudicial error to the trial court for failing to instruct the jury on

16   involuntary manslaughter, a lesser included offense of the charged crime.  (Doc. No. 1 at 29).

17   Son contends there was substantial evidence to show that, instead of killing Graham with malice

18   aforethought as charged, he committed only involuntary manslaughter.  (*Id*.).  After examining

19   the evidence and finding that the instruction was not warranted under state law, the state appellate

20   court found no error by the omission of an instruction on involuntary manslaughter.  (Doc. No.

21   11-22 at 25).  Respondent is correct that Ground Two fails to state a cognizable federal habeas

22   claim because Petitioner cannot show that the state court's decision was contrary to clearly

23   established federal law.

24   Federal habeas review is limited to deciding whether a state court decision violates the

25   Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); *Swarthout v. Cooke*, 562

26   U.S. 216, 219 (2011) (per curiam).  While the Supreme Court has held the failure of a state court

27   to instruct on a lesser included offense in a capital murder case is error if there was evidence to

28   support a lesser include offense instruction, *Beck v. Alabama*, 447 U.S. 625, 638 (1980), the

1  Supreme Court reserved judgment as to "whether the Due Process Clause would require the

2  giving of such instructions in a noncapital case[.]"  *Id*. at 638 n.14; *see also Keeble v. United*

3  *States*, 412 U.S. 205, 213 (1973) (The Supreme Court has "never explicitly held that the Due

4  Process Clause of the Fifth Amendment guarantees the right of a defendant to have the jury

5  instructed on a lesser included offense. ...").  And, the Ninth Circuit Court has made clear that

6  "the failure of a state trial court to instruct on lesser included offenses in a non-capital case does

7  not present a federal constitutional question." *Windham v Merkle*, 163 F.3d 1092, 1106 (9th Cir.

8  1998); *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000) (per curiam).  Therefore, it was not

9  objectively unreasonable for the state appellate court to conclude that Son has no valid federal

10  due process claim to support habeas relief based on the omission of a state law involuntary

11  manslaughter instruction in this non-capital case.

12         Thus, Ground Two is without merit.

13                **C.  Ground Three – Imposition of Assessment and Fines**

14         In his final ground, Petitioner contends that the trial court's imposition of assessments and

15  fines without first being afforded a hearing to determine his ability to pay violated his due process

16  and equal protection rights.  (Doc. No. 1 at 35).  Respondent is correct that this claim is not

17  cognizable on federal habeas review.

18         Specifically, claims challenging restitution orders or fines do not affect a petitioner's fact

19  or duration of confinement, such claims are not cognizable on habeas review.  *See Bailey v. Hill*,

20  599 F.3d 976, 989 (9th Cir. 2010) (finding no jurisdiction over in-custody petition raising a

21  challenge to restitution order); *United States v. Gianelli*, 543 F.3d 1178, 1184 n. 7 (9th Cir. 2008)

22  (fining no jurisdiction where petitioner is not seeking release from custody and "review of

23  restitution order is not properly brought in habeas petition.") (citations omitted).  Moreover, the

24  fact that Son may challenge his conviction on other grounds, "does not create jurisdiction to

25  review the fine." *Tuggle v. Campbell*, 261 F. App'x 56, 58 (9th Cir. 2007); *see also United States*

26  *v. Thiele*, 314 F. 3d 399, 401 (9th Cir. 2002) (noting "cognizable claims in a § 2255 motion do

27  not run interference for non-cognizable claims" and '[n]on cognizable claims do not morph into

28  cognizable ones by osmosis."); *Gutierrez v. Groves*, 2017 WL 840655, at *62 (E.D. Cal. Mar. 3,

1   2017) (findings and recommendations adopted, 1:14-cv-1753 AWI-JLT (E.D. Cal. May 10, 2017)

2   ("Petitioner is not in custody pursuant to a restitution fine; therefore, a challenge to the restitution

3   fine has no effect on Petitioner's custody.").

4          Thus, Petitioner is not entitled to relief on Ground Three because it fails to raise a

5   cognizable federal claim.

6          **V.  CERTIFICATE OF APPEALABIILTY**

7          A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

8   court's denial of a petition; he may appeal only in limited circumstances.  *See* 28 U.S.C. § 2253;

9   *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a

10  district court to issue or deny a certificate of appealability when entering a final order adverse to a

11  petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th

12  Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial

13  showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This standard requires

14  the petitioner to show that "jurists of reason could disagree with the district court's resolution of

15  his constitutional claims or that jurists could conclude the issues presented are adequate to

16  deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *accord Slack v.*

17  *McDaniel*, 529 U.S. 473, 484 (2000).  Because the petitioner has not made a substantial showing

18  of the denial of a constitutional right, the undersigned recommends that the court decline to issue

19  a certificate of appealability.

20         Accordingly, it is **RECOMMENDED**:

21         1.  Petitioner's Petition for Wirt of Habeas Corpus (Doc. No. 1) be denied; and

22         2.  Petitioner be denied a certificate of appealability.

23                        **NOTICE TO PARTIES**

24         These findings and recommendations will be submitted to the United States district judge

25  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fourteen (14)

26  days after being served with these findings and recommendations, a party may file written

27  objections with the Court.  The document should be captioned "Objections to Magistrate Judge's

28  Findings and Recommendations."  Parties are advised that failure to file objections within the

16

specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

Dated:    September 3, 2024

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE

17